# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EDWARD CARLTON SMITH, Jr.,     )
               )
         **Plaintiff,**     )
               )   **CIVIL ACTION**
**v.**               )
               )   **No. 15-9368-JWL**
CAROLYN W. COLVIN,     )
**Acting Commissioner of Social Security,**     )
               )
         **Defendant.**     )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a final decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Supplemental Security Income[1] (SSI) benefits under sections 1602, and 1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 1381a, and 1382c(a)(3)(A) (hereinafter the Act).  Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I.     Background

---

[1]Plaintiff also applied for Disability Insurance Benefits and Disabled Adult Child benefits.  However, the ALJ dismissed Plaintiff's request for hearing on those applications, and Plaintiff does not seek judicial review of that dismissal.  Therefore, the only issue before this court is review of the decision denying Plaintiff's SSI application.

Plaintiff applied for SSI benefits, ultimately alleging disability beginning February 17, 2012.  (R. 11, 45-46).  Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits.  He argues that the ALJ erred at step three in finding that Plaintiff's condition does not meet the criteria of Listing 12.05B or 12.05C, and failed properly to assess Plaintiff's residual functional capacity (RFC).  He asks the court to "reverse the decision of the Commissioner . . . and direct [an] immediate award of benefits."  (Pl. Br. 21).

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord,

Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. § 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the

3

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

The court addresses each issue in the order presented in Plaintiff's Brief.

## II.     Intellectual Disability,[2] Listings 12.05B and 12.05C

Plaintiff claims that he meets the criteria of both Listing 12.05B and 12.05C.  He

argues this is so because he meets the diagnostic description of intellectual disability in

§ 12.05 and because he has a verbal IQ score of 58.  He argues that "the ALJ failed to

even acknowledge or discuss in any way" the verbal IQ score (Pl. Br. 10), and that the

record shows he has "significantly subaverage general intellectual functioning with

deficits in adaptive functioning which manifested before the age of 22."  (Pl. Br. 13).  He

argues that the ALJ erred in finding that the IQ scores were not valid because the

_____

[2]Plaintiff's Brief uses the term "mental retardation," and quotes an earlier version
of the Listings which referred to "Mental Retardation."  (Pl. Br. 10) (quoting and citing
20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00 (2013)).  As the Commissioner points out,
she promulgated a final rule on August 1, 2013 wherein she changed the terminology in
the Listing of Impairments from "Mental Retardation" to "Intellectual Disability."
(Comm'r Br. 8, n.3) (citing 78 Fed. Reg. 46499-01 (Aug. 1, 2013) (effective Sept. 3,
2013).  The regulations in effect when the decision here was signed use the term
"Intellectual Disability."  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05 (2014).

psychologist who administered the intelligence testing, Dr. McNeley-Phelps, did not question the validity of the scores even though she stated that it was unlikely the full scale IQ score of 62 was accurate if Plaintiff had in fact received a GED (general equivalency diploma), and the ALJ should have sought clarification from Dr. McNeley-Phelps if he questioned the validity of the scores.  Id. at 11.  He argues that the ALJ's finding that Plaintiff received a GED is uncertain and was based solely on a form completed by someone at the Wyandotte Mental Health Center, id., and in any case the award of a GED or a high school diploma, or the statement of an unknown clinician that Plaintiff's intellectual functioning was average is not inconsistent with mild intellectual disability. Id. at 12.  Plaintiff argues there is no evidence he ever took or passed a GED, and he does not recall taking the exam.  Id. at 14.

The Commissioner argues that the ALJ considered both Listing 12.05B and 12.05C, and reasonably concluded Plaintiff did not establish that he meets either Listing because the IQ scores were not valid.  (Comm'r Br. 8-9).  She argues that the ALJ reasonably determined Plaintiff has a GED and, therefore, Dr. McNeley-Phelps's report supports his conclusion that the scores are not valid.  Id. at 10.  Moreover, she argues the overall tenor of the psychiatrist's report supports the finding that the test scores are not valid.  Id. at 10-11.  She argues that the totality of the evidence supports the ALJ's findings that the IQ scores are not valid, and that the Listings are not met.  Id. at 12.  The court finds that the ALJ applied the correct standard at step three and the record evidence supports his step three findings.

**A.      The ALJ's Step Three Findings**

In his step two analysis, the ALJ found that Plaintiff does not have intellectual disability which is severe within the meaning of the Act or regulations, but he recognized serious questions in that regard, and noted that "[d]espite the weakness of the claimant's complaints, I have still considered the impact of intellectual deficits upon functioning." (R. 13-14).  In his step three analysis, the ALJ explained his consideration of Listings 12.05B and 12.05C:

> As discussed in detail below, however, there are serious questions about the claimant's supposed IQ score and low intellectual functioning.  Dr. McNeley-Phelps, who conducted the examination, questioned its validity and indicated that she did not feel that it accurately reflected the claimant's intellectual ability.  Such a low score also does not comport with the claimant obtaining a GED.  In addition, clinical notes from Wyandot Center did not mention any significant cognitive deficits and at least one report from Wyandot Center indicates that the claimant's intellectually [sic] functioning appears to be in the normal range.  The claimant also presented himself well during the hearing.  He was articulate and made his points without difficulty.  Based upon these factors, I did not consider this low IQ score cited by counsel to be valid or reflective of the claimant's intellectual abilities.  Thus, I do not find that his mental condition meets or equals listing 12.05 (C).  In addition, the requirements in paragraph A in listing 12.05 are not met because the claimant does not have the mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded.  Furthermore, the "B" criteria of the listing is not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less.

(R. 14).

In discussing his RFC assessment, the ALJ summarized Dr. McNeley-Phelps's report, stating that Dr. McNeley-Phelps opined that the IQ scores did not appear accurate

and had based her opinion on treatment notes from the Wyandot Center which gave no

indication of low intellectual functioning, reflected that Plaintiff's intellectual capacity

appeared normal, and showed that Plaintiff had apparently obtained a GED.  (R. 16).  The

ALJ found that Plaintiff "should not perform complex and detailed tasks," but found the

IQ scores not valid.  Id.  He noted that the Wyandot Center treatment notes "do not reflect

that the claimant has any significant cognitive deficits," and that Plaintiff's articulate,

coherent, and thoughtful answers at the hearing support the finding that his IQ scores are

not valid.  (R. 17).  He also found that Plaintiff "has obtained a GED."  Id. at 18.

### B.      Step Three Standard for Evaluating Listing 12.05B and 12.05C

The "Listing of Impairments" describes the severity of certain impairments that the

Commissioner considers disabling.  20 C.F.R. § 416.925(a); see also, 20 C.F.R., Pt. 404,

Subpt. P, App. 1.  If Plaintiff's condition meets or medically equals the severity of a listed

impairment, his impairment is conclusively presumed disabling.  Williams, 844 F.2d at

751; see Bowen v. Yuckert, 482 U.S. 137, 141 (1987) (if an impairment "meets or equals

one of the listed impairments, the claimant is conclusively presumed to be disabled").

However, Plaintiff "has the burden at step three of demonstrating, through medical

evidence, that his impairments 'meet all of the specified medical criteria' contained in a

particular listing."  Riddle v. Halter, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar.

22, 2001) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in Zebley)).

"The [Commissioner] explicitly has set the medical criteria defining the listed

impairments at a higher level of severity than the statutory standard.  The listings define

impairments that would prevent an adult, regardless of his age, education, or work

experience, from performing any gainful activity, not just 'substantial gainful activity.'"

Zebley, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)).

The listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled

regardless of their vocational background."  Yuckert, 482 U.S. at 153.  "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read

expansively."  Caviness v. Apfel, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

> Listing 12.05 provides in relevant part:
>
> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period:  i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * *

B.	A valid verbal, performance, or full scale IQ of 59 or less;

C.	A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05.

> Listing 12.05 is somewhat different than the other listings for mental disorders.

Id., § 12.00A.  That Listing contains a diagnostic description of intellectual disability

(introductory paragraph) and four sets of criteria describing listing-level severity

8

(Paragraphs A through D).  20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 12.00A, 12.05(A-D).

Paragraphs A through D provide four distinct and independent ways in which an

individual having significantly subaverage general intellectual functioning with deficits in

adaptive functioning initially manifested during the developmental period might satisfy

the criteria of Listing 12.05.  Id.; McKown v. Shalala, No. 93-7000, 1993 WL 335788, *1

(10th Cir. Aug. 26, 1993) (decided when the Listing terminology used "mental

retardation").  To meet the listing, a claimant must show that his condition satisfies both

the diagnostic description of intellectual disability and any one of the four severity

criteria.  Id., § 12.00A.

       The regulations provide that where verbal, performance, and full scale IQ scores

are derived from a test, the lowest score of the three will be used when considering

Listing 12.05.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00D(6)(c).  If the claimant has an

additional physical or mental impairment(s) which is "severe" within the meaning of 20

C.F.R. § 416.920(c), it will be considered to impose an additional and significant work-

related limitation of function satisfying the third criterion of Listing 12.05C.  20 C.F.R.,

Pt. 404, Subpt. P, App. 1 § 12.00(A); see also, Hinkle v. Apfel, 132 F.3d 1349, 1352-53

(10th Cir. 1997) (reaching the same conclusion before the regulations were changed in

2000 to specify the equivalence between "severe" impairments and "additional and

significant work-related limitation of function.").  Based upon the principles discussed

above, to meet Listing 12.05B or C, a claimant must show that certain criteria are met:

(1) evidence of onset of intellectual disability before age twenty-two (deficits in adaptive

9

functioning initially manifested during the developmental period), and (2) a valid IQ score of 59 or less for Listing 12.05B, or of 60 through 70 for Listing 12.05C, and, for Listing 12.05C, (3) a severe physical or mental impairment in addition to the alleged intellectual disability.

### C.    Analysis

Although the court entertains serious doubts whether the record evidence demonstrates that Plaintiff had deficits in adaptive functioning initially manifested during the developmental period, it need not address that thorny issue because it finds that the ALJ properly determined the IQ scores secured in testing by Dr. McNeley-Phelps are not valid. As the ALJ noted, Dr. McNeley-Phelps questioned the validity of the IQ test scores. She noted in her report:

> At times [Plaintiff] seemed to put forth a good effort on the tasks. However, i[f] he did earn his GED, it is unlikely that his full scale IQ score of 62 is accurate. Also in a 2012 progress note from the Wyandot Center, the clinician marked his intellectual functioning as being within normal limits and within the average range.

(R. 404) (emphases added). Dr. McNeley-Phelps provided three specific bases for finding the IQ scores not valid:  Plaintiff only put forth good effort at times, his earning of a GED is inconsistent with such low scores. and his mental health treatment providers found his intellectual functioning within the average range. Plaintiff's argument that Dr. McNeley-Phelps "did not question the validity of the test results themselves" (Pl. Br. 11) (capitalization omitted), takes an overly technical view of the psychologist's report and ignores the clear weight of that report. Moreover, as the Commissioner points out, the

tenor of her report considered as a whole suggests that she did not find the IQ scores

valid.  She did not find Plaintiff's intellectual functioning was borderline or exhibited

mild "mental retardation" or "intellectual disability," but that it "is in the extremely low

range."  (R. 405).  She assessed a global assessment of functioning (GAF) score of 55,

suggesting moderate, rather than serious or worse symptoms, id., and she opined that

Plaintiff is "able to understand instructions and perform simple tasks."  (R. 406).

Contrary to Plaintiff's argument, the ALJ stated his rationale and did not

"summarily dismiss" the IQ scores.  Consequently there was no need to seek further

clarification from the psychologist regarding their validity.  Moreover, the ALJ did not

ignore the verbal IQ score of 58.  While he did not specifically mention that score, he

found that the paragraph B criteria of the listing were not met "because the claimant does

not have a valid verbal, performance, or full scale IQ of 59 or less."  (R. 14) (emphasis

added).  There would be no basis to make this finding had he not recognized the verbal IQ

score of 58 assessed by Dr. McNeley-Phelps.  Plaintiff's argument that "the workers at

the Wyandot Center were not evaluating his intellectual ability or had any reason to

assess it" (Pl. Br. 12), is likewise unavailing.  Wyandot Center was providing mental

health treatment to Plaintiff, and appropriately evaluated his intellectual ability if for no

other reason than to determine if he had insight into his condition and treatment, and if he

could understand appropriate means of responding to that treatment.

While, as Plaintiff argues, a high school diploma or a GED alone does not preclude

finding mild intellectual disability, in this case Dr. McNeley-Phelps relied upon the

11

presence of a GED as one of several bases to question the validity of the IQ scores Plaintiff received, and neither the ALJ nor this court is qualified to reject her medical opinion without a basis in the record evidence. Moreover, Plaintiff is incorrect when he argues that "there is no evidence that he ever took the G.E.D. exam or, more importantly, that he ever successfully passed the G.E.D. exam." (Pl. Br. 14). In a Disability Report completed by Plaintiff on July 27, 2012, he reported to the Social Security Administration that he had a GED. (R. 307). Treatment records from Wyandot Center on multiple occasions note that Plaintiff got a GED. (R. 374 (7/26/2012), 378 (8/02/2012), 392 (3/23/2013)). And, as Dr. McNeley-Phelps mentioned and Plaintiff acknowledges, Wyandot Center records state that his intellectual functioning is average. (R. 375). All of this is record evidence that Plaintiff successfully received a GED. And, there is simply no record evidence that Plaintiff did <u>not</u> get a GED. The only testimony provided by Plaintiff was, "I tried to get one." (R. 33). To be sure, counsel told the ALJ, and now argues, that Plaintiff is not certain, that he recalls studying for the GED, but does not think he ever passed it (R. 33), but even counsel admitted that Plaintiff "thought he might have gotten it." (R. 42). The arguments of counsel are not evidence. It is for the ALJ to decide questions of fact and to resolve ambiguities in the evidence. Here, he determined Plaintiff has a GED, and the record evidence supports his finding. And, the evidence also supports his finding that Plaintiff's IQ scores are not valid. Plaintiff has shown no error in the ALJ's finding that his condition does not meet Listing 12.05B or12.05C.

## III. RFC Assessment

Plaintiff claims that the ALJ's RFC assessment is erroneous in several respects. He argues that the ALJ "made no function-by-function assessment" and provided no narrative discussion in his RFC assessment. (Pl. Br. 17). He argues that the ALJ provided insufficient justification to discount Dr. McNeley-Phelps's marked limitations, and that the ALJ stated that the mental evaluations suggest Plaintiff can perform simple repetitive tasks with limited social interaction, but failed to assess a limitation to repetitive tasks. Id. at 18. The Commissioner argues that the ALJ devoted a three-page narrative to explaining his function-by-function assessment. (Comm'r Br. 13). She argues that the ALJ considered Dr. Witt's and Dr. McNeley-Phelps's medical opinions, and provided reasons which are supported by the record evidence explaining why he discounted Dr. McNeley-Phelps's marked limitations. Id. at 14-15. And, the Commissioner argues that the ALJ's reference to "simple repetitive type work" is merely a shorthand means of referring to work within the RFC assessed which he explained more fully elsewhere in his decision, and in fact the Dictionary of Occupational Titles (DOT) explains that two of the representative jobs relied upon by the ALJ are "repetitive or short cycle work." (Comm'r Br. 15-16) (citing DOT Nos. 381.687-018, and 222.387-030).

Contrary to Plaintiff's argument otherwise, the ALJ made a sufficient function-by-function assessment of Plaintiff's abilities and provided a narrative discussion explaining his RFC assessment in accordance with Soc. Sec. Ruling (SSR) 96-8p. (R. 14-17). The court must exercise common sense in reviewing the ALJ's reasoning and "cannot insist

on technical perfection."  <u>Keyes-Zachary v. Astrue</u>, 695 F.3d 1156, 1166 (10th Cir. 2012).

The ALJ properly weighed the record medical opinions of Dr. Witt and Dr. McNeley-Phelps and gave them both weight despite Plaintiff's contention that the mental evaluations referred to by the ALJ did not include that of Dr. McNeley-Phelps.  (R. 17). The ALJ found that the "medical evaluations show[ed] the claimant to be more capable than alleged," and that they showed Plaintiff "can perform simpl[e] repetitive type tasks with limited social interaction."  <u>Id.</u>  He stated that he gave the mental evaluations weight, but not "every specific finding made by doctors in them."  <u>Id.</u>  He explained that he discounted the marked deficits opined by Dr. McNeley-Phelps because Plaintiff's "overall functioning and activities of daily living show more mild to moderate limitations."  <u>Id.</u>  Plaintiff's argument that the ALJ did not cite evidence to support his finding and that there is no such evidence is without merit.  First, there is no requirement that an ALJ <u>cite</u> evidence supporting each finding.  Rather, he is required to explain his findings, and those findings must be <u>supported by</u> the record evidence.  While it might be helpful to the court if the ALJ had cited supporting evidence, the real question is whether the evidence supports the findings.  Here, it does.  As the Commissioner points out, Dr. Witt's opinion is just such evidence.  Although Dr. McNeley-Phelps opined that Plaintiff was mildly limited in interacting with coworkers and markedly limited in interacting with supervisors (R. 409), Dr. Witt opined that Plaintiff would be moderately limited in his ability to interact both with coworkers and with supervisors, noting that Plaintiff "has antisocial tendencies and would do best in a job with limited interaction."  (R. 108).

14

Moreover, as Dr. Witt also noted, Plaintiff reported he had fewer anger outbursts after he began taking medication.  (R. 380) c.f., (R. 105).

Finally, Plaintiff's argument that repetitive tasks are not synonymous with simple tasks does not require remand.  While Plaintiff's assertion is technically correct, there is no error here.  The decision reveals that one of the ALJ's concerns was that Plaintiff's work not include frequent changes which would frustrate and annoy Plaintiff and increase the potential for conflict.  (R. 15-16) (short temper, mood swings, anti-social traits).  He alleviated this concern by allowing only work which was socially isolated and did not require teamwork, frequent contact, or working primarily with the general public, and required only oral instructions.  Id., c.f., (R. 58) (hypothetical presented to the vocational expert).  Anything other than work with tasks that are time-consuming or relatively repetitive would require more frequent oral instructions, and would violate the requirement for only occasional contact with supervisors.  Not surprisingly then, as the Commissioner points out, two of the representative jobs suggested by the vocational expert and relied upon by the ALJ are defined in the DOT as "repetitive or short cycle work."  DOT Nos. 381.687-018, and 222.387-030.

Because Plaintiff has shown no reversible error in the decision below, remand is not appropriate, and the court need not consider Plaintiff's request for a directed award of benefits.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated this 17th day of November 2016, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**